**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | |
|---|---|
| **APG, LLC**<br>1350 Mountain View Circle<br>Azusa, CA 91702<br><br>   Plaintiff,<br><br>  v.<br><br>**PROPLASTICS, LLC**<br>1542 Fair Road<br>Sidney, OH 45365<br><br>  and<br><br>**DECATUR MOLD TOOL & ENGINEERING, INC.,**<br>3330 North State Highway 7<br>North Vernon, IN 47265<br><br>   Defendants. | CASE NO.:<br><br><br>JUDGE:<br><br><br><br><br>**(DEMAND FOR JURY TRIAL)** |

**COMPLAINT**

Plaintiff APG, LLC, for its Complaint against Defendants ProPlastics, LLC and Decatur Mold Tool & Engineering, Inc., states as follows:

**PARTIES, JURISDICTION, AND VENUE**

1. Plaintiff APG, LLC ("**APG**") is a California limited liability company with its principal place of business at 1350 Mountain View Circle, Azusa, California.

2. Defendant ProPlastics, LLC ("**ProPlastics**") is an Ohio limited liability company with its principal place of business at 1542 Fair Road, Sidney, OH 45365.

3. Defendant Decatur Mold Tool & Engineering, Inc. ("**Decatur**"), is an Indiana corporation with its principal place of business at 3330 North State Highway 7, North Vernon, IN 47265.

4. This Court has original jurisdiction over this Action pursuant to 28 U.S.C. §§ 1332(a) and 1441(b) because each of the entities party to this litigation are citizens of different states and, as will be established, the amount in controversy exceeds $75,000.

5. Venue is proper pursuant to 28 U.S. Code § 1391(b)(2).

## THE PRODUCT TOOLS

6. APG realleges and incorporates by reference the allegations contained in the foregoing paragraphs as if fully rewritten herein.

7. APG is a global leader within the cosmetic packaging industry with factories in the United States and Asia.

8. ProPlastics is a custom plastics injection molding company that manufacturers, among other things, custom injection molded products.

9. Since in or about September of 2021, APG and ProPlastics have engaged in an ongoing business relationship in which ProPlastics manufactures and designs products for APG.

10. In or about October of 2021, APG contracted with ProPlastics to manufacture certain molding tools for APG in exchange for compensation.  (*See* Ex. A.)

11. Specifically, ProPlastics was to make two types of molding tools for APG: (1) foaming pump tools (the "**Foaming Tools**"); and (2) lotion pump tools (the "**Lotion Tools**") (collectively, the "**Product Tools**").

12. The Product Tools were intended to be utilized by APG in APG's manufacturing plant located in Defiance, Ohio; specifically, these molding tools – upon completion – were to be used by APG in production of certain cosmetic and personal care products.

13. APG and ProPlastics primarily discussed the Product Tools' design and manufacturing details by email and through purchase orders, in which, the parties confirmed essential details such as (but not limited to):

   a. The expected durability and performance abilities of the Product Tools;

   b. Industry specific tool specifications;

   c. Anticipated and/or expected delivery dates for prototype and final versions of the Product Tools;

   d. Anticipated and/or expected delivery dates for finalized versions of the Product Tools; and

   e. Curing any defects and/or flaws of a given Product Tool.

(*See e.g.*, Ex.'s B, F.)

14. Before finalizing the Product Tools, ProPlastics was to produce prototype versions for APG's review and approval to ensure that the final versions of the Product Tools would comply with: (1) the requisite design specifications discussed by APG and ProPlastics; (2) product specifications as established through ongoing correspondences related to the Products' design; and (3) to ensure that the Product Tools complied with industry standards as established by the Society of the Plastics Industry ("**SPI**").

15. In addition, APG and ProPlastics further established other specifications and product-related requirements, as well as timing considerations, through various purchase orders and quotes. By way of example:

   a. ProPlastics issued a purchase order quote, identified as Quote: 09132021 D0000001 Rev 3 – totaling $1,024,250 – that detailed numerous product-related design considerations and lead times. (Ex. A.)

   b. ProPlastics issued a purchase order quote, identified as Quote: 09132021 D0000002 Rev 3 – totaling $982,750 – that detailed numerous product-related design considerations and lead times. (*Id.*)

31956912.2

    *c.* ProPlastics issued a purchase order quote, identified as Quote: 09132021 D0000003 Rev 2 – totaling $568,630 – that detailed numerous product-related design considerations and lead times. (*Id.*)

16. Thus, in addition to email correspondences had between APG and ProPlastics, the parties verified design expectations and lead times relating to the Product Tools through purchase orders and quotes. (*See id.*; Ex.'s B, F.)

17. As noted above, among the discussed design specifications was the agreement and understanding that the Product Tools would meet certain SPI standards; specifically, the Product Tools were to comply with SPI Class 101 specifications.

18. Products that meet the SPI 101 classification are products that can undergo 1,000,000 (or more) cycles of production, and thus, are designed to be utilized for extremely high production environments.

19. Furthermore, products that meet the SPI 101 classification are considered to be the highest price molds and are made with the highest quality materials, as is the industry standard for SPI 101 molds.

20. Ensuring that the Products complied with the SPI 101 classification and the classification's standards were essential to the Product Tools' design and was the basis for APG's reliance on contracting with ProPlastics to manufacture the Product Tools.

21. Upon agreeing to manufacture the Product Tools, APG received various purchase orders from ProPlastics throughout the year of 2021 pertaining to the Product Tools, prototype molds of the Product Tools, and their manufacturing, to which, APG routinely paid. (Ex. C.)

22. To date, APG has paid $9,219,216.34 to ProPlastics in relation to the Product Tools and its manufacturing, in addition to $126,836.55 for various shipping-related costs. (*Id.*)

## **THE PRODUCT FAILS TO PERFORM AS AGREED UPON**

23. APG realleges and incorporates by reference the allegations contained in the foregoing paragraphs as if fully rewritten herein.

24. In or about December of 2021, ProPlastics informed APG that it intended to subcontract a portion of the Product Tools' manufacturing to Decatur, which is a manufacturing company located in Indiana that "specializ[es] in injection mold manufacturing."[1]

25. ProPlastics assured APG that Decatur was qualified to assist in the Product Tools' manufacturing and, upon information and belief, Decatur made these same assurances to ProPlastics.

26. Upon information and belief, Decatur entered into a contract with ProPlastics in which Decatur agreed to assist in the manufacturing of the Product Tools for the benefit of APG as a third-party beneficiary to this contract.

27. Despite having subcontracted the Product Tools' manufacturing to Decatur, ProPlastics and Decatur routinely failed to produce a working version of the Foaming Tools that complied with the requisite specifications and have failed to produce a working, or otherwise finalized version, of the Lotion Tools which have yet to ship from Decatur's manufacturing facilities in China.

28. In or about November 22, 2022, APG conducted initial tests on the Foaming Tools and discovered numerous defects with its functionality.

29. Specifically, the Foaming Tools would fail well before accomplishing 1,000,000 cycles and would not function as otherwise designed; notably, reaching 1,000,000 cycles, in accordance with the SPI 101 standard, was an essential feature requested by APG.

---

[1] Decatur Mold Tool & Engineering, Inc., "ABOUT US," https://decaturmold.com/about-us/.

30. APG notified ProPlastics and Decatur of this discovery and requested that ProPlastics investigate the failure and to make the requisite repairs as to ensure that subsequent versions of the Foaming Tool would perform as expected.

31. On or about December 27, 2022, the Foaming Tools were again tested by APG, to which, APG discovered that the Foaming Tools would fail after 7,500 cycles, which again, drastically fell short of the SPI 101 standard of 1,000,000 cycles.

32. APG again notified ProPlastics and Decatur of this failure in an effort to have these defects cured and to ensure that subsequent versions of the Foaming Tools would perform as expected. (*See* Ex. F.)

33. Accordingly, APG maintained regular communication with both ProPlastics and Decatur regarding the Product Tools' manufacturing and the repair of any defects, among other topics, relating to the Product Tools. (*See* Ex.'s B, F.)

34. In addition to the Foaming Tools' failure to meet the requisite cycle range, the Foaming Tools manufactured by Defendants also experienced failures such as (but not limited to):

   a. Galling due to improper metal on metal contact and broke in various ways due to what could only be failures on the design and manufacturing end of the tools;

   b. Defects in the mold design and performance of runner ejection of mesh housing;

   c. Like metals used in close proximity resulting in Product Tool seizure;

   d. Liquid piston defects, broken ejector sleeves, galled core pins, and galled cavity inserts; and

   e. Air piston defects, namely, product runners would get stuck on the tool, rendering it unable to run cycle-to-cycle automatically.

(*See* Ex. D; *see also* Demonstrative Ex. E.)

35. In short, it was clear that the Foaming Tools failed to meet the SPI 101 standards, as well as other discussed specifications, in accordance with the correspondences shared between

APG, Decatur, and ProPlastics and per the purchase orders/quotes.

36. To date, APG has still not received a working or otherwise finalized version of the Foaming Tool from ProPlastics and Decatur, despite ProPlastics initially agreeing to provide a final version of the Foaming Tool in or about May of 2022.

37. To date, APG has still not received a working or otherwise finalized version of the Lotion Tool from ProPlastics or Decatur, despite ProPlastics initially agreeing to provide a final version of the Lotion Tools in or about August of 2022.

38. To date, Defendants have only provided APG with prototype versions of the Lotion Tool and have yet to ship a working or otherwise finalized version of the Lotion Tool that complies with the requisite specifications from Decatur's manufacturing facilities in China.

39. To date, ProPlastics and Decatur have failed to produce a working version of the Product Tools that comply with industry standards and in accordance with the design-requirements and other specifications as outlined through shared correspondences between APG, ProPlastics, and Decatur and per the purchase orders/quotes.

## COUNT ONE
**Breach of Contract – Defendant ProPlastics**

40. APG realleges and incorporates by reference the allegations contained in the foregoing paragraphs as if fully rewritten herein.

41. By agreeing to produce the Foaming Tools, and by working with APG toward finalizing the Foaming Tools' design and performance specifications, ProPlastics entered into a valid and legally enforceable contract with APG.  (*See* Ex.'s A-B, F.)

42. At all times relevant hereto, APG performed the obligations required of it under this contract.

7

43. Subject to this contract, and as is outlined throughout email correspondences shared between APG, ProPlastics, and Decatur, as well as through purchase orders, ProPlastics agreed that the Foaming Tools would be able to perform 1,000,000 cycles and that they would otherwise comply with the requisite SPI 101 standards.

44. Subject to this contract, APG has routinely paid the purchase orders submitted by ProPlastics, and to date, APG has paid: (1) $9,219,216.34 to ProPlastics for the Product Tools' manufacturing and other manufacturing related expenses; and (2) $126,836.55 for shipping-related costs pertaining to the Product Tools and their prototypes – totaling $9,256,052.89.  (Ex. C.)

45. Accordingly, ProPlastics has breached this contract by failing to produce a working version of the Foaming Tool in accordance with the expected design specifications and performance abilities, as outlined by and through the parties' ongoing correspondences and through the purchase orders.

46. As a direct and proximate result of the above breach, APG has been unable to commence its own production of internal products because it does not have a working version of the Foaming Tools as agreed upon.

47. Accordingly, and as an ongoing result of ProPlastics's breach of this agreement, APG has suffered damages by and through having paid approximately $9,256,052.89 to ProPlastics through ProPlastics' purchase orders, approximately $18,880,973.74 in consequential damages, maintenance service costs related to servicing defective versions of the Foaming Tools, and shipping costs, in addition to other ongoing damages, monetary damages and/or damages that may be discovered after the filing of this Action in an exact amount to be determined at trial.

## COUNT TWO
## Breach of Contract – Defendant ProPlastics

48. APG realleges and incorporates by reference the allegations contained in the foregoing paragraphs as if fully rewritten herein.

49. By agreeing to produce the Lotion Tools, and by working with APG toward finalizing the Lotion Tools' design and performance specifications, ProPlastics entered into a valid and legally enforceable contract with APG.  (*See* Ex.'s A-B, F.)

50. At all times relevant hereto, APG performed the obligations required of it under this contract.

51. Subject to this contract, and as is outlined throughout email correspondences shared between APG, ProPlastics, and Decatur, as well as through purchase orders, ProPlastics agreed to produce the Lotion Tools in accordance with the necessary design specification and performance capabilities; however, to date, APG has yet to receive a working or otherwise finalized version of the Lotion Tool, and ProPlastics has yet to even ship and/or facilitate shipment of the product from Decatur's manufacturing plant in China.  (*See id.*)

52. Subject to this contract, APG has routinely paid the purchase orders submitted by ProPlastics, and to date, APG has paid: (1) $9,219,216.34 to ProPlastics for the Product Tools' manufacturing and other manufacturing related expenses; and (2) $126,836.55 for shipping-related and other costs – totaling $9,256,052.89.  (Ex. C.)

53. Accordingly, ProPlastics has breached this contract by failing to produce a working version of the Lotion Tool in accordance with the expected design specifications and performance abilities, as outlined by and through the parties' ongoing correspondences and through the purchase orders.

54. As a direct and proximate result of the above breach, APG has been unable to commence its own production of internal products because it does not have a working version of the Lotion Tools as agreed upon.

55. Accordingly, and as an ongoing result of ProPlastics's breach of this agreement, APG has suffered damages by and through having paid approximately $9,256,052.89 to ProPlastics through ProPlastics' purchase orders, approximately $18,880,973.74 in consequential damages, shipping costs, in addition to other ongoing damages, monetary damages and/or damages that may be discovered after the filing of this Action in an exact amount to be determined at trial.

## COUNT THREE
### Breach of Contract – Defendant Decatur

56. APG realleges and incorporates by reference the allegations contained in the foregoing paragraphs as if fully rewritten herein.

57. Upon information and belief, Decatur entered into a contract with ProPlastics in which Decatur agreed to assist ProPlastics with the manufacturing of the Foaming Tools for APG's benefit as a third-party beneficiary to this subcontractor agreement.

58. In fact, Decatur was regularly involved in ongoing correspondences between APG and ProPlastics as such related to the Foaming Tools and sometimes corresponded with APG directly. (*See e.g.*, Ex. F.)

59. Decatur's involvement in the manufacturing of the Foaming Tools, and the subcontractor agreement that was formed by and between Decatur and ProPlastics, strictly arose out of APG's request for the manufacturing of the Foaming Tools.

60. Thus, by failing to produce the Foaming Tools in accordance with the requisite design standards, SPI standards, and/or in accordance with the Parties' communications, Decatur has breached its subcontractor agreement with ProPlastics, to which, APG was a third-party

beneficiary of.

61. Accordingly, APG has standing to pursue enforcement of the ProPlastics/Decatur subcontractor agreement because it was the intended third-party beneficiary of this agreement.

62. As a direct and proximate result of Decatur's breach of this agreement, APG has been unable to commence its own production of internal products because it does not have a working version of the Foaming Tools as agreed upon.

63. Accordingly, and as an ongoing result of Defendant's breach of its agreement with ProPlastics, APG has suffered damages by and through having paid approximately $9,256,052.89 to ProPlastics through ProPlastics' purchase orders, approximately $18,880,973.74 in consequential damages, maintenance service costs related to servicing defective Foaming Tools, and shipping costs, in addition to other ongoing damages, monetary damages and/or damages that may be discovered after the filing of this Action in an exact amount to be determined at trial.

## COUNT FOUR
### Breach of Contract – Defendant Decatur

64. APG realleges and incorporates by reference the allegations contained in the foregoing paragraphs as if fully rewritten herein.

65. Upon information and belief, Decatur entered into a contract with ProPlastics in which Decatur agreed to assist ProPlastics with the manufacturing of the Lotion Tools for APG's benefit as a third-party beneficiary to this subcontractor agreement.

66. In fact, Decatur was regularly involved in ongoing correspondences between APG and ProPlastics as such related to the Lotion Tools and sometimes corresponded with APG directly. (*See e.g.*, Ex. F.)

67. Decatur's involvement in the manufacturing of the Lotion Tools, and the subcontractor agreement that was formed by and between Decatur and ProPlastics, strictly arose

out of APG's request for the manufacturing of the Lotion Tools.

68. Thus, by failing to produce the Lotion Tools in accordance with the requisite design standards, SPI standards, and/or in accordance with the Parties' communications, Decatur has breached its subcontractor agreement with ProPlastics, to which, APG was a third-party beneficiary of.

69. Accordingly, APG has standing to pursue enforcement of the ProPlastics/Decatur subcontractor agreement because it was the intended third-party beneficiary of this agreement.

70. As a direct and proximate result of Decatur's breach of this agreement, APG has been unable to commence its own production of internal products because it does not have the Lotion Tools as agreed upon.

71. Accordingly, and as an ongoing result of Defendant's breach of its agreement with ProPlastics, APG has suffered damages by and through having paid approximately $9,256,052.89 to ProPlastics through ProPlastics' purchase orders, approximately $18,880,973.74 in consequential damages, maintenance service costs related to servicing defective Foaming Tools, and shipping costs, in addition to other ongoing damages, monetary damages and/or damages that may be discovered after the filing of this Action in an exact amount to be determined at trial.

## COUNT FIVE
### Breach of Express Warranty – Defendants ProPlastics and Decatur

72. APG realleges and incorporates by reference the allegations contained in the foregoing paragraphs as if fully rewritten herein.

73. APG, ProPlastics, and Decatur are all "merchants" as outlined by Ohio law and Uniform Commercial Code ("**UCC**").

74. ProPlastics, by agreeing to produce the Foaming Tools in accordance with the parties' email correspondences, as well as through purchase orders, has breached the express

warranty associated with the Foaming Tools pursuant to Ohio Rev. C. § 1302.26, also identified as UCC 2-313.

75. Decatur, by agreeing to assist ProPlastics with the manufacturing of the Foaming Tools, and by failing to produce a working version of the Foaming Tools in accordance with the parties' email correspondences and purchase orders, has also breached the express warranty associated with the Foaming Tools.

76. Defendants expressly warranted, affirmed, and promised that they would produce to APG a Foaming Tool product that complied with the terms and specifications as outlined through the parties' correspondences and purchase orders, in addition to SPI 101 standards.

77. Defendants' assurances that they could manufacture a product in accordance with these standards was the basis for APG's willingness to rely on either party to manufacture the Foaming Tools.

78. By failing to produce a working version of the Foaming Tools, Defendants have breached this warranty.

79. Specifically, the Foaming Tools have failed to meet the requisite SPI cycle range and also experienced failures such as (but not limited to):

    a. Galling due to improper metal on metal contact and broke in various ways due to what could only be failures on the design and manufacturing end of the tools;

    b. Defects in the mold design and performance of runner ejection of mesh housing;

    c. Like metals used in close proximity resulting in Product Tool seizure;

    d. Liquid piston defects, broken ejector sleeves, galled core pins, and galled cavity inserts; and

    e. Air piston defects, namely, product runners would get stuck on the tool, rendering it unable to run cycle-to-cycle automatically.

13

80. As a direct and proximate result of this breach, APG has been unable to commence its own production of internal products because it does not have a working version of the Foaming Tools.

81. Accordingly, and as an ongoing result of Defendants' breach of this warranty, APG has suffered damages by and through having paid approximately $9,256,052.89 to ProPlastics through ProPlastics' purchase orders, approximately $18,880,973.74 in consequential damages, maintenance service costs related to servicing defective Product Tools, and shipping costs, in addition to other ongoing damages, monetary damages and/or damages that may be discovered after the filing of this Action in an exact amount to be determined at trial.

## COUNT SIX
### Breach of Implied Warranty – Defendants ProPlastics and Decatur

82. APG realleges and incorporates by reference the allegations contained in the foregoing paragraphs as if fully rewritten herein.

83. ProPlastics, by agreeing to produce the Foaming Tools in accordance with the parties' email correspondences, as well as through purchase orders, has breached the implied warranty associated with the Foaming Tools pursuant to Ohio Rev. C. §§ 1302.27 and 1302.28, also identified as UCC 2-314 and UCC 2-315.

84. Decatur, by agreeing to assist ProPlastics with the manufacturing of the Foaming Tools, and by failing to produce a working version of the Foaming Tools in accordance with the parties' email correspondences and purchase orders, has also breached the implied warranty associated with the Foaming Tool.

85. Defendants' assurances that they could manufacture a product in accordance with these standards was the basis for APG's willingness to rely on either party to manufacture the Foaming Tools.

86. Specifically, the Foaming Tools have failed to meet the requisite SPI 101 cycle range and also experienced failures such as (but not limited to):

   a. Galling due to improper metal on metal contact and broke in various ways due to what could only be failures on the design and manufacturing end of the tools;

   b. Defects in the mold design and performance of runner ejection of mesh housing;

   c. Like metals used in close proximity resulting in Product Tool seizure;

   d. Liquid piston defects, broken ejector sleeves, galled core pins, and galled cavity inserts; and

   e. Air piston defects, namely, product runners would get stuck on the tool, rendering it unable to run cycle-to-cycle automatically.

87. Defendants had reason to know of the required expectations of the Foaming Tools, the Foaming Tools' fitness of a particular purpose, and the implied performance abilities of such products when agreeing to manufacture the Foaming Tools, and APG relied on Defendants' skill and experience to furnish a product in accordance with the above-noted specifications.

88. By agreeing to manufacture the Foaming Tools, Defendants warranted and promised that it could produce the Foaming Tools as agreed upon by the parties, and as such, Defendants established an implied warranty as to the Foaming Tools and its ability to perform.

89. By failing to produce a working version of the Foaming Tools, Defendants have breached this warranty.

90. As a direct and proximate result of this breach, APG has been unable to commence its own production of internal products because it does not have a working version of the Foaming Tools.

91. Accordingly, and as an ongoing result of Defendants' breach of this warranty, APG has suffered damages by and through having paid approximately $9,256,052.89 to ProPlastics through ProPlastics' purchase orders, approximately $18,880,973.74 in consequential damages,

maintenance service costs related to servicing defective Foaming Tools, and shipping costs, in addition to other ongoing damages, monetary damages and/or damages that may be discovered after the filing of this Action in an exact amount to be determined at trial.

## COUNT SEVEN
### Unjust Enrichment – Defendant ProPlastics

92. APG realleges and incorporates by reference the allegations contained in the foregoing paragraphs as if fully rewritten herein.

93. APG asserts Count Seven in the alternative to Count One and/or Count Two.

94. APG has conferred a benefit upon ProPlastics by, among other things, paying on various invoices for costs associated with and/or arising out of the Product Tools' manufacturing and other related expenses. (*See* Ex. C.)

95. ProPlastics has retained these monetary payments despite not producing the Product Tools as agreed upon.

96. ProPlastics knew of and accepted these payments and continues to retain these payments and/or other benefits despite not having produced or provided the Product Tools as agreed upon.

97. The continued retention by ProPlastics of the payments and/or other benefits conferred on it would be unjust under the circumstances.

98. As a direct and proximate result of the action of ProPlastics, APG has suffered damages in an amount to be determined at trial.

## COUNT EIGHT
### Quantum Meruit – Defendant ProPlastics

99. APG realleges and incorporates by reference the allegations contained in the foregoing paragraphs as if fully rewritten herein.

100. APG asserts Count Eight in the alternative to Count Seven.

101. APG has conferred a benefit upon ProPlastics by, among other things, continually working toward finalizing the manufacturing of the Product Tools and by paying on amounts owed for the Product Tools' manufacturing, despite not having been provided the Product Tools as outlined by the parties' correspondences and purchase orders.

102. The continued retention by ProPlastics of the benefits APG has conferred on it would be unjust under the circumstances.

103. As a direct and proximate result of the action of ProPlastics, APG has suffered damages in an amount to be determined at trial.

## COUNT NINE
### Unjust Enrichment – Defendant Decatur

104. APG realleges and incorporates by reference the allegations contained in the foregoing paragraphs as if fully rewritten herein.

105. APG asserts Count Nine in the alternative to Count Three and/or Count Four.

106. Upon information and belief, Decatur entered into a contract with ProPlastics in which ProPlastics subcontracted a portion of the Product Tools' manufacturing to Decatur.

107. APG has paid on various invoices for costs associated with and/or arising out of the Product Tools' manufacturing and design to ProPlastics, and, upon information and belief, ProPlastics has compensated Decatur for its assistance in the manufacturing and design of the Product Tools.

108. Thus, by retaining compensation for work and/or services rendered as such relates to the Product Tools, Decatur has been unjustly enriched because it has failed to produce a working version of the Product Tools that meets the terms as outlined by the parties' ongoing correspondences and purchase orders.

109. Decatur has retained this compensation despite having not produced the Product Tools as agreed upon and the continued retention by Decatur of the benefits of APG conferred on it would be unjust under the circumstances.

110. As a direct and proximate result of the action of Decatur, APG has suffered damages in an amount to be determined at trial.

## COUNT TEN
### Quantum Meruit – Defendant Decatur

111. APG realleges and incorporates by reference the allegations contained in the foregoing paragraphs as if fully rewritten herein.

112. APG asserts Count Ten in the alternative to Count Nine.

113. APG has conferred a benefit upon Decatur by, among other things, continually working toward finalizing the manufacturing of the Product Tools and by paying on amounts owed for the Product Tools' manufacturing, despite not having been provided the Product Tools as outlined by the parties' correspondences and purchase orders.

114. Upon information and belief, ProPlastics has compensated Decatur for its assistance in the manufacturing and design of the Product Tools, despite Decatur's failure to manufacture the Product Tools in accordance with the requisite specifications and standards.

115. The continued retention by Decatur of the benefits APG has conferred on it would be unjust under the circumstances.

116. As a direct and proximate result of the action of Decatur, APG has suffered damages in an amount to be determined at trial.

31956912.2

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff APG, LLC requests that this Court:

a. Render judgment in favor of APG as to all Claims raised herein;

b. An award of damages in favor of APG and against Defendants ProPlastics and Decatur, but not limited to:

   i. $9,219,216.34 for moneys paid by APG toward the manufacturing and design of the Product Tools;

   ii. $126,836.55 in shipment costs;

   iii. $18,751,637.19 in consequential damages as a result of Defendants' failure to timely deliver a working version of the Product Tools;

   iv. $2,500 in maintenance service costs related to servicing defective Product Tools; and

   v. Any costs associated with and/or relating to production losses as a result of Defendants' failure to deliver a working version of the Product Tools in a timely manner.

c. An award for monetary damages, ongoing damages, and any other damages that this Court sees fit;

d. An award of APG's attorneys' fees, court costs, and any other related fees or costs incurred with pursuing this Action;

e. For any and all other relief, whether legal or equitable, to which APG may be entitled.

Dated: June 19, 2023                            Respectfully submitted,

                                                /s/ Bryan T. Kostura
                                                Bryan T. Kostura (0078785)
                                                Michael W. Wise (0046694)
                                                **McDonald Hopkins LLC**
                                                600 Superior Avenue E., Suite 2100
                                                Cleveland, OH 44114
                                                T:    216.348.5400
                                                E:    bkostura@mcdonaldhopkins.com
                                                      mwise@mcdonaldhopkins.com

                                                *Attorneys for Plaintiff*